## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

===============================

|  |  |  |
|---|---|---|
| **AUCTUS FUND, LLC, and** | : |  |
| **EMA FINANCIAL, LLC** | : |  |
|  | : |  |
| **Plaintiffs,** | : |  |
|  | : |  |
| **v.** | : | **Civil Action No. _____** |
|  | : |  |
| **SUNSTOCK, INC.,** | : |  |
|  | : |  |
| **Defendant.** | : |  |
|  | : |  |

===============================

## COMPLAINT AND DEMAND FOR JURY TRIAL

## I. INTRODUCTION

1.     The Plaintiffs, Auctus Fund, LLC, (hereinafter "Auctus"), and EMA Financial, LLC (hereinafter "EMA"), respectfully submit their Complaint and Demand for Jury Trial (hereinafter the "Complaint") against the Defendant, Sunstock, Inc. (hereinafter the "Company" or "SSOK"), in the above-captioned action.  The Plaintiffs' allegations, as set out herein, are asserted for their respective damages arising from, and resulting from, the Defendant's violations of the following:

a)      Section 10(b) of the Securities Exchange Act of 1934, *as amended* (hereinafter the "Exchange Act"), 15 U.S.C. §78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5;

b)      Massachusetts Uniform Securities Act, M.G.L. c.110A, §§ 101, *et seq.*, *as amended* (hereinafter the "Uniform Securities Act"), solely as to Auctus;

c)      breaches of contract;

d)      breaches of implied covenant of good faith and fair dealing;

e)      unjust enrichment;

f)      breaches of fiduciary duty;

g)      fraud and deceit;

h)      negligent misrepresentation; and/or

i)      the Massachusetts Consumer Protection Act, M.G.L. c. 93A, §§ 2 and 11, *as amended*, solely as to Auctus.

2.      The Plaintiffs further allege that, as a result and as caused by the Defendant's breaches, actions, omissions, policies, practices, and/or courses of conduct, Auctus and EMA have suffered irreparable harm to their respective businesses and reputations in the investment industry, damages from the Defendant's coercion, duress, and unfair and deceptive anti-competitive acts, causing lost revenue, lost profits and prospective business, together with its injuries and damages.

3.      The Plaintiffs respectfully request that their causes of action against the Defendant proceed to a trial by jury, that judgment be entered on all Counts against the Defendant and that Auctus and EMA be awarded their respective compensatory damages and losses, costs, interest, plus multiple and/or punitive damages, attorneys' fees, and grant, order and enter temporary, preliminary and permanent injunctive and equitable relief, and any such other relief as this Honorable Court deems just and appropriate.

## II. <u>PARTIES</u>

4.      The Plaintiff, Auctus Fund, LLC is a duly organized limited liability company with its principal place of business located at 545 Boylston Street, 2nd Floor, Boston, Massachusetts 02116.

5.     The Plaintiff, EMA Financial, LLC is a duly organized limited liability company with its principal place of business located at 40 Wall Street, 17th Floor, New York, New York 10005.

6.     Upon information and belief, the Defendant, Sunstock, Inc., is a duly organized corporation with a principal place of business located at 111 Vista Creek Circle, Sacramento, California 95935.

### III. JURISDICTION AND VENUE

7.     The Plaintiffs assert that this Honorable Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, and under the Securities Act of 1933, *as amended*, 15 U.S.C. §§ 77a, *et seq.* (hereinafter the "Securities Act"), and under the Exchange Act, 15 U.S.C. §§ 78a, *et seq.*

8.     The Plaintiffs further contend that, pursuant to 28 U.S.C. § 1391(b), venue is proper in the District of Massachusetts in that, pursuant to the Transaction Documents (defined below), the Plaintiff Auctus and Defendant SSOK agreed that any and all disputes between and/or among them shall be brought, *inter alia*, in the state or federal courts in the Commonwealth of Massachusetts. Additionally, this Court is in such District where the Plaintiff Auctus is headquartered and has its principal place of business, and is where the violative conduct described herein is alleged to have occurred.

9.     This Court has personal jurisdiction, generally and specifically, over the Defendant by express terms of the Auctus Transaction Documents, and as arising from its extensive business contacts, generally over time and specifically, in their business dealings with Plaintiff Auctus within the Commonwealth of Massachusetts. The Plaintiffs respectfully assert that the claims and causes of action have the same common nexus of operative facts as to both Auctus and EMA, and

that certain of the facts and legal issues are common to their respective claims, and as such, the claims are appropriately joined herein.

## IV. FACTUAL BACKGROUND

**A.      Defendant's Misrepresentations and Omissions of Material Facts
And Fraud in Connection with the Offer and Sale of Securities**

10.      Upon information and belief, Defendant SSOK was incorporated in or about 2012 and is based in Sacramento, California. According to its website and as relied upon by the Plaintiffs, to their detriment, as a first alleged business strategy, the Company has falsely stated that it sought to "design, develop and operate deep discount retail stores in the basic consumer goods market," and claims that it "operates one retail store under the Dollar Green Stores name in Sacramento, California." *See* Certain Pages of the SSOK Website, dated November 26, 2018, attached, restated and incorporated by reference herein as **Exhibit A-1**.  The Defendant further falsely represented and omitted material facts while having a duty to disclose the same, that it intended to acquire: a) "[i]ncome producing properties with strong cash flow;" and b) "[a]ffordable residential properties." *Id.* at p. 3. SSOK allegedly had "plans to build a "recession based portfolio" and had "plans to divest up to half of its cash proceeds in ***SILVER BULLION***." *Id.* (original caps, bold and italics). Moreover, the Defendant completed a "due diligence questionnaire," as requested by Plaintiff EMA, that the Company's intended "use of proceeds" was to make a down payment upon retail property, which statements were false and materially misleading.

11.      As relied upon by the Plaintiffs, to their detriment, as a second alleged business strategy, the Company has falsely asserted that it "intends to acquire and operate hotels, rental income properties…." *Id.* The Defendant has further misrepresented and omitted material facts while having a duty to disclose the same, that "the Company intends to strategically target investments in hotels, residential real estate…." *Id.*

12.     On or about March 8, 2017, the Defendant fraudulently claimed that it "[l]aunche[d] [a] Rehabilitation Housing Division," and falsely stated, as relied upon by the Plaintiffs, to their detriment, in pertinent part,

### "Sunstock, Inc. Launches Rehabilitation Housing Division

SACRAMENTO, CA–(Marketwired – March 8, 2017) – Sunstock, Inc. (the "Company" or "Sunstock") (OTCBB: SSOK) announced the opening of its No-Frills Rehabilitation Housing Division.

Sunstock's business strategy combines income producing real estate properties with investments in precious metals.  The management team with over 20 years of hospitality industry experience has identified a distinct need for clean, safe and affordable rehabilitation housing facilities.  Management has developed a plan to implement a strategy to bring no-frills rehabilitation housing facilities to the California market and eventually expand nationally.

Sunstock is in the _final stage of negotiating the acquisition of a hotel in California_.  After purchasing the hotel, Sunstock plans to convert the hotel to a no-frills rehabilitation housing facility that will provide a clean, safe room and transportation to clients enrolled in a substance abuse treatment program.  Sunstock has hired a management team to oversee the hotel conversion to a no-frills rehabilitation housing facility.

Sunstock's research has discovered a high demand for these types of rehabilitation housing facilities in California. After the transfer of the hotel ownership, Sunstock forecasts this project _will generate over 10 million dollars in gross revenue in the first 18 months_.  Sunstock believes that this revenue prediction is sustainable and will prove to be a successful pilot project and springboard to future growth."

_Id._ at 7 (emphasis added).

13.     As a third alleged business strategy the Defendant falsely claimed to utilize "crowdfunding" as a part of its business model.  _Id._ As relied upon by the Plaintiffs, to their detriment, the Company has fraudulently represented that,

"Sunstock, Inc. has an exciting future as its management team explores all of the new age opportunities presented by the crowdfund platform.  Crowdfunding permits traditional real estate the ability to discover and then acquire or develop properties the Company may not have otherwise known were available and broadens its target from local or regional to national.  Crowdfunding also offers

Sunstock the opportunity to identify projects to potentially develop via crowdsourced funding blended in with its own financing sources."

*Id.*

14. On or about April 5, 2016, the Defendant has allegedly further falsely asserted that,

**"Sunstock, Inc. is Seeking to Acquire a Real Estate Portfolio Through Crowdfunding**

SACRAMENTO, CA — 04/05/16 — Sunstock, Inc. is seeking to acquire a portfolio of undervalued real estate using an exciting and novel combination of stock and crowdfunding based financing."

*Id.*

15. As stated on or about March 6, 2016 and as relied upon by the Plaintiffs, to their detriment, the Company further fraudulently represented that,

**"Sunstock is the first small-cap publicly traded** real estate crowdfunding firm planning to adopt the SPV model, which as the name suggests, will create crowdfunded vehicles to raise the capital to invest in pre-identified acquisition targets, or pre-identified sectors of the real estate market. In short, crowdfunding is a near limitless source of capital for a firm like Sunstock.

**Sunstock will additionally** seek to enhance the attractiveness of its offers to acquisition targets, by offering shares in the corporation itself, to the sellers of properties targeted to be acquired and added to its portfolio.

\*\*\*\*

*Sunstock is the first company that allows investors **to invest directly in the Organizer** of crowd funded projects (like directly into Fundrise), as opposed to simply investing in the properties of the Organizer. This is a very interesting investment opportunity. Investors can simply purchase open market shares of Sunstock, Inc. (SSOK).*

\*\*\*\*

Now that we know the basic alternatives for financing available to *Sunstock, let's look at the markets they are in*. The Company *will leverage its investment in residential real estate development in Sacramento and the California Region*.

\*\*\*\*

6

> *Target market for residential apartments includes one-person to three-person households. Further, target market also includes single parents that constitute the large portion of target market within two-person households*.
>
> ****
>
> To achieve the Company's objectives, *Sunstock, Inc. is seeking $20.9 million in total funding in 5 trenches*. The funding will be allocated in a variety of ways including staffing, operations, and marketing initiatives. *Utilizing the Company's own reserves and crowdfund sourced funds, Sunstock, Inc. will acquire residential apartments in Sacramento and other California regions*. Sunstock, Inc.'s *management team is well-qualified to execute this investment strategy*. The company will provide residents with the best quality homes and superior customer service. The company plans to initially acquire residential apartments and hotels in California. To diversify the investment in residential property, the company subsequently plans to move to the Southern Region of California."

See "*Innovative Real Estate Company Sunstock, Inc. Goes Public*," at pp. 2-4 (original bold; emphasis added), as attached to a Certain Page of the SSOK Website, dated on or about March 6, 2016, attached, restated and incorporated by reference herein as **Exhibit A-2**.

16.    As a fourth alleged business strategy, the Defendant has falsely stated that it sought to "hold a strong position in silver commodities."   As relied upon by the Plaintiffs, to their detriment, the Defendant has fraudulently asserted that:

> "The demand for metals is continuing alongside a growing global population that will have a greater overall need for products such as cars, computers and household goods all of which can't be produced without metals.  Gold has been the primary accepted tangible asset used as money for thousands of years.  As a result of the recent recession, gold hit an all-time high of $1,900 an ounce in 2011.  Gold which is considered a currency and hedge against inflation has fallen by a third since 2011 to below $1,250 per ounce on average.  While the price of gold has suffered over the past five years, the metal will continue to be stored by central banks as a backup to more common currency.  On the other hand, Silver considered a hybrid metal for its use as a currency and in the industrial application has been hit the hardest in the past three years, falling by more than half to below $20 per ounce on average.  Silver is in a slump, but demand for the metal will continue given its strength and thermal conductivity, which is used in a number of industrial applications from electronics to automobiles."

**Exhibit A-1**, at p. 7.

17.     As stated on or about February 22, 2016 and as relied upon by the Plaintiffs, to their

detriment, the Company made misrepresentations that,

### "Sunstock, Inc.'s Silver Accumulation Plan

SACRAMENTO, CA — (Marketwired) — 02/22/16 — Sunstock, Inc. (the "Company" or "Sunstock") (OTCBB: SSOK) has concluded that stimulative monetary policies adopted by the United States, European Union, China, and Japan have set the stage that may cause inflation to rise and increase the value of precious metals. Japan, Sweden and Switzerland have announced and implemented policies to impose negative interest rates in their retail banking systems to persuade their citizens to increase consumer spending.

The spot price of silver as of February 16, 2016, was traded at $15.28 per ounce. Sunstock, Inc. believes that this precious metal is currently undervalued, and it is a strategic time to purchase more silver.

Sunstock, Inc. _holds over 21,000 ounces of silver in inventory_ and plans to acquire an additional 80,000 ounces of silver over the next year. Sunstock, Inc. plans to _acquire 20,000 ounces of silver by May 31, 2016, and continue to acquire an additional 20,000 ounces of silver every 90 days, thereafter, for a combined total purchase of 80,000 ounces of silver by February 28, 2017_.

Upon completion of the planned additional acquisition of 80,000 ounces of silver, Sunstock, Inc. would _hold a total inventory of over 100,000 ounces_.

Sunstock, Inc. _intends to finance the planned additional acquisition of 80,000 ounces of silver from equity sales of the Company's securities_."

_Id._ at pp. 8-9. (emphasis added).

18.     Moreover, the Defendant has further falsely represented that it would make annual

purchases of silver, of not less than 100,000 ounces / year, in order to take advantage of its strategic

position in the bullion. _Id._ at p.1 (video).

19.     Upon information and belief, the Defendant has never, _inter alia_, designed,

developed and/or operated "deep discount retail stores in the basic consumer goods market," and

its representations to the contrary are, and were, materially false and fraudulent and omitted

material facts while having a duty to disclose the same, and were made in connection with the offer and sale of securities to the Plaintiffs.

20.     Upon information and belief, the Defendant has never, *inter alia*, operated any retail store under the Dollar Green Stores name in Sacramento, California," and its representations to the contrary are, and were, materially false and fraudulent and omitted material facts while having a duty to disclose the same, and were made in connection with the offer and sale of securities to the Plaintiffs.

21.     Upon information and belief, the Defendant has never, *inter alia*, "acquire[d] and[/or] operate[d] hotels, rental income properties," and its representations to the contrary are, and were, materially false and fraudulent and omitted material facts while having a duty to disclose the same, and were made in connection with the offer and sale of securities to the Plaintiffs.

22.     Upon information and belief, the Defendant has never, *inter alia*, been in the "final stage of negotiating the acquisition of a hotel in California," and its representations to the contrary are, and were, materially false and fraudulent and omitted material facts while having a duty to disclose the same, and were made in connection with the offer and sale of securities to the Plaintiffs.

23.     Upon information and belief, the Defendant has never, *inter alia*, launched a "No-Frills Rehabilitation Housing Division," and its representations to the contrary are, and were, materially false and fraudulent and omitted material facts while having a duty to disclose the same, and were made in connection with the offer and sale of securities to the Plaintiffs.

24.     Upon information and belief, the Defendant has never, *inter alia*, made quarterly purchases or acquisitions of 20,000 ounces of silver bullion, and its representations to the contrary are, and were, materially false and fraudulent and omitted material facts while having a duty to

disclose the same, and were made in connection with the offer and sale of securities to the Plaintiffs.

25.    Upon information and belief, the Defendant has never, *inter alia*, made annual purchases or acquisitions of 100,000 ounces of silver bullion, and its representations to the contrary are, and were, materially false and fraudulent and omitted material facts while having a duty to disclose the same, and were made in connection with the offer and sale of securities to the Plaintiffs.

26.    Instead, in breach of its contractual and fiduciary duties to the Plaintiffs, the Defendant decided to fraudulently invest its time, energy and the Plaintiffs' money in "Triple 8," crypto tokens. Thus, on or about August 13, 2018 and as relied upon by the Plaintiffs, to their detriment, the Company made misrepresentations, in pertinent part, as follows,

### "Sunstock, Inc.'s (SSOK) Management Team Moves Forward with "Triple 8," Precious Metal Asset Back Crypto Tokens

*Blockchain Strategist and Angel Investor Mr. James Sowers Becomes Company Advisor*

SACRAMENTO, CA, Aug. 13, 2018 (GLOBE NEWSWIRE) -- Sunstock, Inc. (SSOK: OTCMARKETS) announces that <u>after months of due diligence</u> its management team believes "Triple 8" to become the crypto tokens backing the Company's assets held in precious metals.

<u>*'Triple 8s' tokens leverages precious metal investments while revolutionizing, improving and expanding the value of money, backed in precious metal assets*</u>. As such, harnessing the metal values makes "Triple 8" a unique crypto with efficiencies and traceable liquidities. Token holders can spend their diversified portfolio back in precious metals within a payment infrastructure familiar to that used in current banking platforms using fiat monies. By tokenizing precious metals into the blockchain, <u>*"Triple 8" introduces a user friendly and valid monetary system. Redefining how the world uses and understands money flows, the launch of "Triple 8" as asset-back crypto currencies, tied to gold, silver and platinum bullion provides real world value, not seen since the loss of the U.S. dollar monetary gold standard*</u>.

*SSOK's management believes that "Triple 8" paves the way for new levels of security and transparency in precious metal investing* with the development of innovative technologies such as **"IoT** Smart Vaults" for storing assets and RFID tags, smart cameras and smart scales for tracking logistics as the assets travel to the vault from their source. Devices can track logistics into the blockchain in real-time, creating verifiable sourcing and authenticity of assets.

Further, **Mr. James Sowers,** an internationally acclaimed blockchain strategist joined Sunstock, Inc. as an advisor to management over the integrations of the Company's precious metal asset portfolio into value added crypto currencies, like "Triple 8." Recently, a **Forbes Magazine article listed** Mr. Sowers ranking as 28 out of the top 50 successful leading angel investors. He provides expert commentary on crypto currencies and blockchain trends as a TV personality on **"Exploring the Block,"** which is a paid-for-TV business program syndicated on the TV **FOX BUSINESS Network.**

'Triple 8s' ICO- Initial Coin Offering introduces a money system which is valid, transparent, and accountable, all through the use of blockchain technology, with one token equaling one gram of each precious metal or combination of precious metals."

*See* SSOK Press Release, dated August 13, 2018, at pp.1-2, attached, restated and incorporated by reference herein as **Exhibit A-3.** (original bold; emphasis added).

27. Additionally, on or about December 12, 2018, the Company made misrepresentations, in pertinent part, as follows,

## "Sunstock, Inc.'s (SSOK) Contracts with Flashmoni to assist on $10M Capital Raise and ICO

SACRAMENTO, CA, Dec. 12, 2018 (GLOBE NEWSWIRE) -- Sunstock, Inc. (SSOK: OTCMARKETS) announces hiring Flashmoni for assistance on a $10,000,000 capital raise.

Flashmoni provides strategic and operational leadership and ICO (Initial Coin Offering) fundraising opportunities, Management at SSOK believes Flashmoni's expertise can assist with the Company's ICO capital raise objectives.

Sunstock anticipates a successful $10M capital raise utilizing the funds for the Company's 'Triple 8' ICO, a cybercurrency backed by precious metals. 'Triple 8's' blockchain technology introduces a money system which is valid, transparent, and accountable. One 'Triple 8' token equals one gram of each precious metal or combination of precious metals.

Management believes Flashmoni through its vast domestic and international contacts can help SSOK reach the $10M raised in a combination of Fiat dollars, BTC-Bitcoin, and ETH-Ethrium cryptos.

'Triple 8's' ICO allows furthering the tokenization of precious metals into a blockchain. The launch of 'Triple 8' as an asset-backed cryptocurrency, tied to gold, silver, and platinum bullion provides real-world value, not seen since the loss of the U.S. dollar monetary standard.

SSOK expects that certain percentages of monies raised to advance the further developments of its innovative technologies, such as 'loT Smart Vaults' for storing assets, RFID tags, smart cameras, and smart scales. Such devices can track logistics into the blockchain in real-time, creating verifiable sourcing and authenticity of assets.

SSOK's Management will provide updated information accordingly on its pending 'Triple 8' ICO and capital raise objective, $10M."

*See* SSOK Press Release on NASDAQ, dated December 12, 2018, at p.1, attached, restated and incorporated by reference herein as **Exhibit A-4.**

28.    Upon information and belief, the Defendant has never, *inter alia*, conducted "months of due diligence" into "Triple 8" crypto tokens, and its representations to the contrary are, and were, materially false and fraudulent and omitted material facts while having a duty to disclose the same, and were made in connection with the offer and sale of securities to the Plaintiffs.

29.    Upon information and belief, the Defendant has never, *inter alia*, and is not, in the process of a $10 million dollar "capital raise," is not in the process of commencing an Initial Coin Offering (ICO) with Flashmoni or any other such third-party, and/or that such "asset-backed cryptocurrency, tied to gold, silver, and platinum bullion provides real-world value, not seen since the loss of the U.S. dollar monetary standard," and its representations to the contrary are, and were, materially false and fraudulent and omitted material facts while having a duty to disclose the same, and were made in connection with the offer and sale of securities to the Plaintiffs.

30.     In truth and in fact, the Defendant's alleged plans to conduct an "ICO are false and fraudulent, and any such investments in "Triple 8" crypto token is speculative, highly risky and constituted misrepresentations of material facts and omissions of material fact, with a duty of full disclosure, to the Plaintiffs.

31.     Moreover, the Plaintiffs have never agreed to the Defendant's use of the proceeds of their respective loans in order for the Company to engage in speculative and risky ICO's, cryptocurrencies or "Triple 8" tokens, and Sunstock's representations regarding the same are, and were, materially false and fraudulent and omitted material facts while having a duty to disclose the same, and were made in connection with the offer and sale of securities to the Plaintiffs.

32.     Indeed, the U.S. Securities and Exchange Commission (hereinafter the "SEC" or the "Commission") has repeatedly warned public investors of the risks inherent in investments in cryptocurrencies and fraud and deceit being perpetrated by issuers, such as the Defendant, upon public investors.

33.     Thus, throughout the mid-2000's, the Commission has instituted investigations and/or published warnings to investors regarding the risks and fraud relating to cryptocurrencies. *See, e.g.,* "*Ponzi Schemes Using Virtual Currencies,*" SEC Office of Investor (dated in or about 2014), attached, restated and incorporated by reference herein as **Exhibit A-5**; "*Investor Alert: Bitcoin and Other Virtual Currency-Related Investments,*" SEC – Investor.gov (dated May 7, 2014), attached, restated and incorporated by reference herein as **Exhibit A-6**; "*Investor Bulletin: Initial Coin Offerings,*" SEC - Investor Alerts (dated July 25, 2017), attached, restated and incorporated by reference herein as **Exhibit A-7**; "*Investor Alerts: Public Companies Making ICO-Related Claims,*" SEC - Investor Alerts (dated August 28, 2017), attached, restated and incorporated by reference herein as **Exhibit A-8**; "*SEC Public Statement: SEC Statement Urging*

*Caution Around Celebrity Backed ICOs,"* SEC – Public Statement (dated November 1, 2017), attached, restated and incorporated by reference herein as **Exhibit A-9**; "*SEC Public Statement: Statement on Cryptocurrencies and Initial Coin Offerings,"* SEC – Public Statement (dated December 11, 2017), attached, restated and incorporated by reference herein as **Exhibit A-10.**

34.    Upon information and belief, the Defendant has also omitted, *inter alia*, material facts to the Plaintiffs regarding its finances and operations including but not limited to its investments in hotels, in rehabilitative housing, in silver bullion and/or in "Triple 8" crypto tokens or other cryptocurrencies, and its representations to the contrary are, and were, materially false and fraudulent and omitted material facts while having a duty to disclose the same, and were made in connection with the offer and sale of securities to the Plaintiffs. *See* Sunstock, Inc. Form 10-Q, filed 11/19/18 for the Period Ending 09/30/18, attached, restated and incorporated by reference herein as **Exhibit A-11.**

35.    Moreover, on or about October 22, 2018, the Defendant acquired all issued and outstanding shares of a small local retail precious metals store, called "Mom's Silver Shop, Inc.," of Sacramento, California, and its representations regarding the same are, and were, materially false and fraudulent and omitted material facts while having a duty to disclose the same, and were made in connection with the offer and sale of securities to the Plaintiffs. *See* Sunstock, Inc. Form 8-K, (dated October 22, 2018), attached, restated and incorporated by reference herein as **Exhibit A-12.**

36.    It is undisputed that the Defendant failed to timely fulfill its reporting obligations under the Exchange Act of 1934, as amended, 15 U.S.C. §§ 78a, *et seq*.

37.    The Plaintiffs assert and allege that the Defendant misrepresented and omitted and failed to provide material facts to Auctus and to EMA in connection with their respective

investments and in the offer, purchase and sale of securities, and especially with respect to the operations, business, finances, future prospects and other matters of Defendant SSOK.

38.     As a direct and proximate cause of the violations of the federal securities laws of the Defendant, Auctus and EMA have suffered irreparable harm, and general, special, and consequential damages, including, but not limited to, loss of profits, interest, and other damages, injuries, and losses, to its detriment, and resulted in the unjust enrichment of the Defendant.

### B.     The Auctus / SSOK Transactions Documents and Contracts

39.     On or about May 24, 2017, the Company executed, *inter alia*, a certain Securities Purchase Agreement (hereinafter the "First Auctus Purchase Agreement" or the "First Auctus SPA") and a certain Convertible Promissory Note (hereinafter the "First Auctus Note" and, with the First Auctus SPA and other documents, collectively hereinafter the "First Auctus Transaction Documents"), thereby entering into a contract with Plaintiff Auctus for its investment in SSOK. *See* First Auctus Purchase Agreement, attached, restated and incorporated by reference herein as **Exhibit B-1**; Note, attached, restated and incorporated by reference herein as **Exhibit B-2**.

40.     On or about October 11, 2017, the Company executed, *inter alia*, a certain Securities Purchase Agreement (hereinafter the "Second Auctus Purchase Agreement" or the "Second Auctus SPA") and a certain Convertible Promissory Note (hereinafter the "Second Auctus Note" and, with the Second Auctus SPA and other documents, collectively hereinafter the "Second Auctus Transaction Documents" and with the First Auctus Transaction Documents, collectively hereinafter the "Auctus Transaction Documents"), thereby entering into a contract with Plaintiff Auctus for its investment in SSOK.  *See* Purchase Agreement, attached, restated and incorporated by reference herein as **Exhibit B-3**; Note, attached, restated and incorporated by reference herein as **Exhibit B-4.**

41.     Thereafter, the Company incurred and/or caused several Events of Default, as set forth in Article III, entitled "*Events of Default*," of the Auctus Notes.  These Events of Default included, *inter alia*, breaches of following provisions of the Auctus Transaction Documents: a) Sections 1.3 (Authorized Shares); b) Section 1.4(g) (Sub-penny conversion price); c) Section 2.8 (Non-Circumvention); d) Section 3.1 (Failure to pay Principal or Interest); e) Section 3.2 (Failure to Honor Conversion); f) Section 3.4 (Breach of Agreement and Covenants – Sections 2.8 of the note – Non-circumvention and 1.3 see above); g) Section 3.5 (Breach of Representations and Warranties – Section 3(g) (SEC Documents; Financial Statements) of the Auctus SPA); and i) Section3.16 (Replacement of Transfer Agent).

42.     Thereafter, it is undisputed that the Company incurred and/or caused several Events of Default, as set forth in Article III, entitled "*Events of Default*," of the Auctus Notes. In addition, pursuant to Section 3.1, an Event of Default shall have occurred by the failure of the Company to pay the principal or interest when due on the Note, whether at maturity, upon acceleration, or otherwise. *See* Notes (**Exhibit B-2**) and (**Exhibit B-4**), § 3.1.  Events of Default, together with others, have occurred and continue to occur.

43.     As a result of such Events of Default and the continuation of the same without cure, on or about July 9, 2018, Plaintiff Auctus delivered its Notice of Default on the May 24, 2017 Note (hereinafter the "First Auctus Default Notice") to the Company. *See* First Auctus Notice of Default, dated July 9, 2018, attached restated and incorporated by reference herein as **Exhibit B-5**. Since the delivery of the First Auctus Notice of Default, the Company has failed to cure the same, which default continues to the present date.

44.     As a result of such Events of Default and the continuation of the same without cure, on or about July 9, 2018, Plaintiff Auctus delivered another Notice of Default on the October 10,

2017 (hereinafter the "Second Auctus Default Notice") to the Company. *See* Second Auctus Notice of Default, dated July 9, 2018, attached restated and incorporated by reference herein as **Exhibit B-6.** Since the delivery of the Second Auctus Notice of Default, the Company has failed to cure the same, which default continues to the present date.

45.     Upon the occurrence of an Event of Default under Section 3.1 of the Auctus Notes, the entire principal and accrued interest shall be due and owing hereunder. Furthermore, an Event of Default pursuant to Section 3 of such Note, the Company is required to pay, and shall pay, Plaintiff Auctus the "Default Sum" (as defined therein), due under the Auctus Notes as multiplied by One Hundred - Fifty and 00/100 (150.00%) percent. Thus, as of the date hereof, the Company owes Plaintiff Auctus, under the First and Second Auctus SPA's and the First and Second Auctus Notes, the Default Sum totaling Five Hundred – Seventy – Six Thousand – Six Hundred – Forty – Four and 60/100 (**$576,644.60**) Dollars (U.S.). Until paid, the Default Sum shall continue to accrue the default interest rate of Twenty-four and 00/100 (24.00%) percent per year, provided by the Notes.

**C.     The EMA / SSOK Transaction Documents and Contracts**

46.     On or about June 5, 2017, SSOK executed, *inter alia*, a certain Securities Purchase Agreement (hereinafter the "First EMA Purchase Agreement" or the "First EMA SPA") and a certain Convertible Promissory Note in the principal amount of $115,000.00 (hereinafter the "First EMA Note" and collectively hereinafter, with the First EMA SPA and other documents, as the "First EMA Transaction Documents").  By the First EMA Transaction Documents, the Company entered into contracts with EMA for its investment in SSOK. *See* First EMA Securities Purchase Agreement, attached, restated and incorporated by reference hereto as **Exhibit C-1**; First EMA Convertible Promissory Note, attached, restated and incorporated as **Exhibit C-2**.

47.     On or about October 11, 2017, SSOK executed, *inter alia*, a certain Securities Purchase Agreement (hereinafter the "Second EMA Purchase Agreement" or the "Second EMA SPA") and a certain Convertible Promissory Note in the principal amount of $85,000.00 (hereinafter the "Second EMA Note" collectively hereinafter, with the Second EMA SPA and other documents, as the "Second EMA Transaction Documents", and collectively hereinafter with the First EMA Transaction Document, as the "EMA Transaction Documents").  By the Second EMA Transaction Documents, the Company entered into contracts with EMA for its investment in SSOK. *See* Second EMA Securities Purchase Agreement, attached, restated and incorporated by reference as **Exhibit C-3**; Second EMA Convertible Promissory Note, attached, restated and incorporated by reference as **Exhibit C-4**.

48.     Thereafter, SSOK incurred and/or caused several Events of Default, as set forth in Article III, entitled "*Events of Default,*" of the Note. These Events of Default included, *inter alia,* breaches of the following provisions of the Transaction Documents: a) Section 1.3 (Authorized Shares) pursuant to Section 3.2 (Conversion and the Shares); c) Section 3.1 (Failure to Pay Principal or Interest); d) Section 3.2 (Conversion and Shares);  e) Section 3.9 (Failure to Comply with the Exchange Act; f) Section 3.15 (Replacement of Transfer Agent); and   ; g) Section 3.16 (Cross Default).  *See* Correspondence by EMA Financial, LLC to the Defendant, dated June 22, 2018, as attached, restated and incorporated by reference as **Exhibit C-5.**

49.     Thereafter, it is undisputed that the Company incurred and/or caused several Events of Default, as set forth in Article III, entitled "*Events of Default*," of the Note. In addition, pursuant to Section 3.1, an Event of Default shall have occurred by the failure of the Company to pay the principal or interest when due on the Note, whether at maturity, upon acceleration, or otherwise.

*See* Notes (**Exhibit C-2**) and (**Exhibit C-4**), § 3.1, 3.2, 3.9, 3.15 & 3.16.  Events of Default, together with others, have occurred and continue to occur.

50.      As a result of these Events of Default and the continuation of the same without cure to the present time, on or about June 22, 2018, Plaintiff EMA delivered its Notice of Default (hereinafter the "EMA Notice of Default") to SSOK. *See* Correspondence by EMA Financial, LLC to the Defendant, dated June 22, 2018, (**Exhibit C-5**). Since the delivery of the EMA Notice of Default, SSOK has failed to cure various defaults, which continues to the date of this filing.

51.      Upon the occurrence of an Event of Default under Section 3.1 of the Notes, two times the entire principal and accrued interest shall be due and owing hereunder. Furthermore, upon the occurrence of an Event of Default pursuant to Article 3 of such Note, the Company is required to pay, and shall pay, Plaintiff EMA the "Default Sum" (as defined therein), due under the Note as multiplied by One Hundred - Fifty and 00/100 (150.00%) percent. Thus, as of November 1, 2018, the Company owes Plaintiff EMA, under the First and Second EMA SPA's and the First and Second EMA Notes, the Default Sum totaling Three Hundred – Sixty One Thousand Seven Hundred Seventy Six Dollars and 55/100 (**$361,776.55**) Dollars (U.S.). Until paid, the Default Sum shall continue to accrue the default interest rate of Twenty-four and 00/100 (24.00%) percent per year, as provided by the Notes.

# V. **VIOLATIONS OF LAW**

## **COUNT I - VIOLATIONS OF FEDERAL SECURITIES LAWS**
### (as to both Plaintiffs Auctus and EMA)

52.     The Plaintiffs reassert Paragraphs 1 through 51 of the Complaint, together with **Exhibits**, and restates and incorporates them herein by reference.

53.     The Defendant violated Section 12(2) of the Securities Act, 15 U.S.C §77l(2), in addition to Section 10(b) of the Exchange Act, 15 U.S.C. §78j(b) and Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5, in that, as described herein, and in connection with the purchase, offer and sale of securities, they knowingly, recklessly and intentionally:

   a)     employed manipulative and deceptive devices and contrivances;

   b)     employed devices, schemes and artifices to defraud;

   c)     made untrue statements of material fact and omitted to state material facts necessary in order to make statements made, in light of the circumstances under which they were made, misleading; and

   d)     engaged in acts, practices and a course of business which operated as a fraud or deceit upon the Plaintiffs.

54.     As a direct and proximate cause of the violations of the federal securities laws by the Defendant, Plaintiffs Auctus and EMA have suffered irreparable harm, and general, special, and consequential damages, including, but not limited to, loss of profits, interest, and other damages, injuries, and losses, to their detriment, and resulted in the unjust enrichment of the Defendant.

## COUNT II - VIOLATIONS OF MASSACHUSETTS STATE SECURITIES LAWS
### (solely as to Plaintiff Auctus)

55.     The Plaintiffs reassert Paragraphs 1 through 54 of the Complaint, together with **Exhibits**, and restates and incorporates them herein by reference.

56.     The Defendant violated Massachusetts Uniform Securities Act, Massachusetts General Laws Chapter 110A, §§ 101, *et seq.*, *as amended*, in that, as described herein, it offered and sold securities by means of untrue statements of material fact and omitted to state material facts necessary in order to make statements made, in light of the circumstances under which they were made, not misleading.

57.     As a direct and proximate cause of the violations of the Massachusetts state securities laws by the Defendant, Plaintiff Auctus has suffered irreparable harm, and general, special, and consequential damages, including, but not limited to, loss of profits, interest, and other damages, injuries, and losses, to its detriment, and resulted in the unjust enrichment of the Defendant.

## COUNT III – BREACHES OF CONTRACTS
### (as to both Plaintiffs Auctus and EMA)

58.     The Plaintiffs reassert Paragraphs 1 through 57 of the Complaint, together with **Exhibits**, and restate and incorporate them herein by reference.

59.     Pursuant to the Auctus and EMA SPA's and the Notes, Plaintiffs Auctus and EMA invested in the Company and sought to become shareholders, in good faith, to join the Company in the accomplishment of its business goals and in accordance with the standards of the business and the securities industry.  Plaintiffs Auctus and EMA contend that the Defendant breached the contract with the Plaintiffs by its conduct, as described herein.

60.     Plaintiffs Auctus and EMA allege that the Company is liable to each of them for a breach of contract and for a breach of an implied covenant of good faith and fair dealing. A breach of contract is failure without excuse to perform a duty which is due under the contract. Additionally, the interpretation of a contract is a question of law, not fact. If the wording is not ambiguous, then the contract must be enforced according to its plain terms.

61.     Plaintiff Auctus performed its obligations under the First and Second Auctus Purchase Agreements and the First and Second Auctus Notes, and in good faith.

62.     The Defendant, by its conduct described herein, violated the Auctus Purchase Agreements and the Notes, breaching its contracts with Plaintiff Auctus.

63.     Plaintiff EMA performed its obligations under the First and Second EMA Purchase Agreements and the First and Second EMA Notes, and in good faith.

64.     The Defendant, by its conduct described herein, violated the EMA Purchase Agreements and the Notes, breaching its contracts with Plaintiff EMA.

65.     As a direct and proximate cause of the Defendant's breaches of its contracts, the Plaintiffs have each suffered irreparable harm, and general, special, and consequential damages, including, but not limited to, loss of profits, interest, and other damages, injuries, and losses, to their detriment, and resulted in the unjust enrichment of the Defendant.

**COUNT IV – BREACHES OF IMPLIED
<u>COVENANT OF GOOD FAITH-FAIR DEALING</u>
(as to both Plaintiffs Auctus and EMA)**

66.     The Plaintiffs reassert Paragraphs 1 through 65 of the Complaint, together with **<u>Exhibits</u>**, and restate and incorporate them herein by reference.

67.     It is well established that every contract carries an implied covenant of good faith and fair dealing whereby the parties treat each other fairly and act in good faith and no party to the

contract shall take any action to harm another party's rights under the contract. The duty imposed by this "implied covenant of good faith and fair dealing" pertains to bad faith in the performance of a contract, not just in its execution or negotiation. Implicit in every contract is the requirement on faithfulness to an agreed upon common purpose and consistency with the justified expectations of the other party.

68.     A breach of contract is the failure to perform for which legal excuse is lacking. As a matter of law, a contract existed, which the Company breached and failed to comply with the covenant of good faith and fair dealing. The law is clear - Plaintiffs Auctus and EMA had binding contracts and the Company has no legal basis, as a matter of law, to avoid its respective obligations under the Auctus Transaction Documents or under the EMA Transaction Documents, or the damages which arose as a result from the breach of the respective Auctus and EMA Purchase Agreements and Notes.

69.     The Defendant had a duty of good faith and fair dealing in its respective dealings with the Plaintiffs and pursuant to the promises, contracts, and statements made to the Plaintiffs to induce Auctus and EMA to enter into the contracts and provide assets to the Defendant in exchange for its promise to repay the same, with interest.

70.     Under the covenant, the Defendant was obligated to good faith performance of its obligations under the respective Transaction Documents with the Plaintiffs, and to be faithful and consistent to the justified expectations of the Plaintiffs.

71.     As described above, the Defendant breached the implied covenant of good faith and fair dealing with the Plaintiffs.

72.     As a direct and proximate cause of the Defendant's breaches of the implied covenant of good faith and fair dealing, the Plaintiffs have suffered irreparable harm, and general,

special, and consequential damages, including, but not limited to, loss of profits, interest, and other damages, injuries, and losses, to their detriment, and resulted in the unjust enrichment of the Defendant.

## COUNT V – UNJUST ENRICHMENT
### (as to both Plaintiffs Auctus and EMA)

73.     The Plaintiffs reassert Paragraphs 1 through 72 of the Complaint, together with the **Exhibits**, and restate and incorporate them herein by reference.

74.     The Defendant illegally received assets and benefits from the Plaintiffs, as arising from its false and fraudulent statements and misrepresentations, and without providing equivalent value therefor.

75.     The Defendant's actions, courses of conduct, and omissions were wantonly, intentionally, and maliciously conducted against each of the Plaintiffs, to their detriment.

76.     The Defendant has been unjustly enriched by its actions, as described herein.

77.     As a direct and proximate cause of the Defendant's unjust enrichment, the Plaintiffs have suffered irreparable harm, and general, special, and consequential damages, including, but not limited to, loss of profits, interest, and other damages, injuries, and losses, to their detriment, and resulted in the unjust enrichment of the Defendant.

## COUNT VI – BREACHES OF FIDUCIARY DUTY
### (as to both Plaintiffs Auctus and EMA)

78.     The Plaintiffs reassert Paragraphs 1 through 77 of the Complaint, together with the **Exhibits**, and restate and incorporate them herein by reference.

79.     A fiduciary relationship existed between each of the Plaintiffs and the Defendant, requiring it to act with a duty of the utmost loyalty and trust on behalf of both Auctus and EMA,

respectively.  As a fiduciary, the Defendant was required to maintain and protect the welfare of each of the Plaintiffs.

80.     By engaging in the conduct described herein, the Defendant breached its fiduciary duties to the Plaintiffs.

81.     As a direct and proximate cause of the Defendant's breach of fiduciary duty, the Plaintiffs have suffered irreparable harm, and general, special, and consequential damages, including, but not limited to, loss of profits, interest, and other damages, injuries, and losses, to their detriment, and resulted in the unjust enrichment of the Defendant.

**COUNT VII  - FRAUD AND DECEIT**
**(as to both Plaintiffs Auctus and EMA)**

82.     The Plaintiffs reassert Paragraphs 1 through 81 of the Complaint, together with the **Exhibits**, and restate and incorporate them herein by reference.

83.     The actions of the Defendant described herein constitute fraud and deceit, including but not limited to the following:

a)     the Defendant made false representations of material facts, and/or omitted material facts with a duty of disclosure, knowing or having reason to know of their falsity;

b)     the Defendant made said misrepresentations and omissions for the purpose of inducing reliance from both Auctus and EMA; and

c)     Plaintiffs Auctus and EMA did rely upon said misrepresentations and omissions, to their detriment.

84.     As a direct and proximate cause of the Defendant's fraud and deceit, the Plaintiffs have suffered irreparable harm, and general, special, and consequential damages, including, but

not limited to, loss of profits, interest, and other damages, injuries, and losses, to their detriment, and resulted in the unjust enrichment of the Defendant.

## COUNT VIII - NEGLIGENT MISREPRESENTATION
### (as to both Plaintiffs Auctus and EMA)

85.     The Plaintiffs reassert Paragraphs 1 through 84 of the Complaint, together with **Exhibits**, and restate and incorporate them herein by reference.

86.     The conduct of the Defendant as described herein constitutes negligent misrepresentation in that the Defendant negligently provided Auctus and EMA with erroneous and misleading information, and negligently omitted material information with a duty to disclose, to the Plaintiffs' respective detriment.

87.     As a direct and proximate cause of the Defendant's negligent misrepresentations, the Plaintiffs have suffered irreparable harm, and general, special, and consequential damages, including, but not limited to, loss of profits, interest, and other damages, injuries, and losses, to their detriment, and resulted in the unjust enrichment of the Defendant.

## COUNT IX - VIOLATIONS OF MASSACHUSETTS
## CONSUMER PROTECTION ACT / M.G.L. C. 93A, §§ 2 & 11
### (solely as to Plaintiff Auctus)

88.     The Plaintiffs reassert Paragraphs 1 through 87 of the Complaint, together with the **Exhibits**, and restate and incorporate them herein by reference.

89.     At all relevant times herein, the Defendant conducted a trade or business, as defined by the Massachusetts Consumer Protection Act, M.G.L. c. 93A, within the Commonwealth of Massachusetts.

90.     The conduct of the Defendant as described herein, constitutes unfair and deceptive trade practices, under Sections 2 and 11 of the Consumer Protection Act, including but not limited to claims that the Defendant:

a) executed the First and Second Auctus Securities Purchase Agreements and the First and Second Auctus Notes with full knowledge and understanding of the Defendant's obligations to Plaintiff Auctus;

b) fraudulently induced Auctus to invest in the Company and thereby breached its promise to repay the Plaintiff;

c) fraudulently concealed from Plaintiff Auctus the full and complete financial and operational details and prospects of the Company in inducing the Plaintiff to make its investment in the Company;

d) knowingly and intentionally concealed these activities from Auctus, to its detriment; and/or

e) violated the requirements, terms and conditions of existing statutes, rules and regulations meant for the protection of the public's health, safety or welfare.

91. As a direct and proximate cause of the Defendant's violations of the Massachusetts Consumer Protection Act, M.G.L. c. 93A, Sections 2 and 11, Plaintiff Auctus has suffered irreparable harm, and general, special, and consequential damages, including, but not limited to, loss of profits, interest, and other damages, injuries, and losses, to its detriment, and resulted in the unjust enrichment of the Defendant.

## VI. <u>REQUESTS FOR RELIEF</u>

WHEREFORE, the Plaintiffs, Auctus Fund, LLC and EMA Financial, LLC, respectfully request that this Honorable Court grant them each the following relief:

A) Order, grant and enter temporary, preliminary and permanent injunctive and equitable relief, and specific performance, and finding that the Plaintiffs have suffered irreparable harm, have a likelihood of success on the merits, that the balance of hardships favors the Plaintiffs and that it is in the public interest to grant such temporary, preliminary and permanent injunctive and equitable relief, and specific performance for the benefit of the Plaintiffs, as set forth herein;

B) Determine that the Defendant is liable for all damages, losses, and costs, as alleged herein;

C) Determine and award the Plaintiffs, Auctus Fund, LLC and EMA Financial, LLC, the actual losses sustained by it as a result of the violations of law by the Defendant, as set forth herein;

D) Render a judgment and decision on behalf of the Plaintiffs, Auctus Fund, LLC and EMA Financial, LLC, on all Counts of the Complaint, and issue findings of fact and rulings of law, as necessary and appropriate, that the Defendant is liable, in all respects;

E) Order, decide, adjudge, and determine that the liability of the Defendant, is for all losses, injuries, and damages, special, consequential, general, punitive, and/or otherwise, and for all interest and costs, as alleged herein;

F) Award the Plaintiffs, Auctus Fund, LLC and EMA Financial, LLC, its costs, including, but not limited to, filing fees, costs, expenses and interest, for being required to prosecute this action;

G)      Award the Plaintiffs, Auctus Fund, LLC and EMA Financial, LLC, its actual attorneys' fees, for being required to prosecute this action;

H)      Award the Plaintiffs, Auctus Fund, LLC and EMA Financial, LLC, multiple, double, treble, and/or punitive damages in an amount to be determined;

I)      Enter judgment on behalf of the Plaintiffs, Auctus Fund, LLC and EMA Financial, LLC, on the Complaint;

J)      Order declaratory relief, as appropriate and as this Honorable Court deems necessary; and/or

K)      Any additional relief, which this Honorable Court deems just and proper.

**THE PLAINTIFFS, AUCTUS FUND LLC AND EMA FINANCIAL, LLC,
DEMAND A TRIAL BY JURY ON ALL COUNTS SO TRIABLE**

Respectfully Submitted,
PLAINTIFFS, Auctus Fund LLC, and
   EMA Financial, LLC

By their Attorneys,


    /s/  *Philip M. Giordano*
Philip M. Giordano, Esq. (BBO No. 193530)
Russell A. Haverty, Esq. (BBO No. 693260)
Giordano & Company, P.C.
REED & GIORDANO, P.A.
47 Winter Street, Suite 800
Boston, Massachusetts 02108-4774
Telephone: (617) 723-7755
Facsimile: (617) 723-7756
Email: pgiordano@reedgiordano.com
Dated: December 13, 2018      Email:  rhaverty@reedgiordano.com